UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DENNIS L. BURMAN, as bankruptcy trustee for the bankruptcy estate of Ransom A. Honeycutt,<br><br>Plaintiff,<br><br>v.<br><br>THE FISHING COMPANY OF ALASKA, INC. a Washington corporation,<br><br>Defendant. | CASE NO. C10-1130 MJP<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

**Preamble**

This case was tried before the Court from June 25, 2012 through June 26, 2012. Plaintiff was represented by Richard J. Davies of Kraft Palmer Davies P.L.L.C. Defendant was represented by Michael A. Barcott of Holmes Weddle & Barcott, P.C. The Court has considered the evidence presented at trial and the arguments of counsel, and being fully advised, makes its Findings of Fact and Conclusions of Law as follows:

\\

**Findings of Fact**

1. Ransom A. Honeycutt ("Honeycutt") is and has been a resident of the state of Washington. Honeycutt was born on January 29, 1971, and was 36 years old at the time of the subject injury on August 1, 2007.

2. Defendant The Fishing Company of Alaska, Inc. ("FCA") was a Washington limited liability corporation with its main offices and doing business in Seattle, King County within the Western District of Washington.

3. FCA was the owner and operator of the F/V ALASKA RANGER and employed Honeycutt as a member of the crew.

4. The F/V ALASKA RANGER was in navigable waters and Honeycutt was in the course and scope of his employment with FCA.

5. Plaintiff Dennis L. Burman is the appointed bankruptcy trustee for the bankruptcy estate of Ransom A. Honeycutt and his spouse, Sandra Honeycutt.

6. The F/V ALASKA RANGER was a 35-year-old factory-trawler owned and operated by FCA. It operated with a crew of approximately 43 FCA employees. The Fish Master and four technicians were employed by a Japanese company, North Pacific Resources. The vessel was 189.4 feet in length, had a beam of 40 feet, gross tonnage of 1,562, and a cargo capacity of 585 long tons (fish products). On the trawl deck, a fish bulwark wall 39-inches high with personnel cutouts extended from the stern ramp towards the wheelhouse on both the starboard and port sides. The trawl deck had two watertight hatches. The aft hatch was used to drop the catch into the fish bin, and the forward hatch led into the factory and was used to offload the catch.

7. Honeycutt and the other fish processors on the F/V ALASKA RANGER worked in three shifts, each with a factory manager in charge. The processors worked continuous sequences of 12 hours on and 6 hours off, with a half hour meal break during the 12 hours work period.

8. Honeycutt injured his right knee while working out on the trawl deck of the F/V ALASKA RANGER assisting with the stacking of the net on the aft end of the trawl deck. On August 1, 2007, at approximately 4:10 a.m., Honeycutt was standing on top of the net pile and, without looking where he would land, jumped over the 39-inch wall on the starboard side of the vessel just aft of the cut-out. When he jumped, Honeycutt landed on the large steel strap that had been left on the deck on the starboard side of the wall. His foot became entangled in the strap and when he pivoted he twisted his knee, causing a total ACL rupture. The metal strap that Honeycutt landed on was composed of a series of $5/8^{th}$ inch steel cables bundled together and was approximately six inches in diameter, somewhat larger than the size of a softball in circumference. Honeycutt reported the incident.

9. Based upon the testimony received, Honeycutt was not in danger of being hit by a swinging net at the time he chose to jump from the net pile to the deck. The testimony of Chris Cossich and Ray Falante, coupled with the lack of any mention of this particular fact in the injury reports supports a finding that the net was not an issue or danger to Honeycutt. There was a safe means of getting off of the net which Honeycutt could have utilized but chose not to. Jumping over the wall was a common occurrence and was not an unusual way for the seaman to move from the aft portion of vessel forward during the net stacking operation.

11. The Court finds that on or about August 1, 2007, FCA, its agents, and employees were negligent and the vessel was unseaworthy in the following respects: (a) for leaving and failing to remove a large metal strap on the outboard side of the 39-inch starboard fish bulwarks in an area where deckhands routinely jumped over the wall to perform their work; (b) for failing to provide Honeycutt with a safe place to work; and (c) for failing to keep the deck clear of obstructions.

12. The Court finds that FCA's negligence and the unseaworthiness of the vessel were the proximate causes of injuries to Honeycutt's right knee.

13. The Court also finds, however, that Honeycutt was 25 percent comparatively at fault. While it was the practice to jump from the net to the walkway on the starboard side of the vessel doing so without looking and then failing to extract himself from the strap prior to pivoting made this an unsafe maneuver.

14. Honeycutt continued onboard the vessel carrying out restricted duties after the incident.

15. Honeycutt was evaluated at the Iliuliuk Family and Health Services, Inc. clinic in Dutch Harbor, Alaska on August 9, 2007. When he was seen at the clinic, Honeycutt reported that the pain would come and go. Because of his ongoing symtoms and positive findings on examination, Honeycutt was declared unfit for duty and advised to return home to Seattle for advanced imaging of the knee and consultation with an orthopedic surgeon.

16. Honeycutt was delayed in returning to Seattle and was evaluated by orthopedic surgeon Jeremy A. Idjadi, M.D. on August 23, 2007.

17. An MRI taken on August 24, 2007 demonstrated: (a) a complete tear of the proximal third of the ACL; (b) a horizontal longitudinal tear of the medial meniscus and posterior horn of the meniscus; and (c) fracture injuries of the posterior lateral tibial condyle to the

1  plateau from impaction. Reviewing the MRI on August, 28, 2007, Dr. Idjadi

2  recommended that Honeycutt proceed with arthroscopic surgery to reconstruct the ACL

3  with a hamstring autograft and to perform a partial medial meniscectomy.

18. On September 28, 2007, Dr. Idjadi performed an ACL reconstruction using a hamstring autograft and also performed a partial medial meniscectomy. His course of recovery was uneventful and progressed as normal.

19. On December 17, 2007, Honeycutt was doing well, going to physical therapy twice a week and was doing his home exercises two to three times a day. He was on-track with his ACL protocol. Honeycutt wanted to return to some type of work and was released to work as long as he did not lift anything greater than 10 to 15 pounds.

20. By January 11, 2008, Honeycutt continued to progress with his physical therapy and home exercise. He return for a fitting of an ACL specific knee brace, which he was instructed to wear when he was out and to avoid slippery surfaces. On physical examination, Honeycutt had full range of motion in his right knee and his quadriceps were equal bilaterally.

21. Later in January, Honeycutt was not wearing his brace and slipped on ice in his driveway. Returning to Dr. Idjadi on January 17, 2008, Honeycutt had moderate swelling of the knee and evidence of 3-4 m.m. of translation with anterior drawer testing with a moderately firm endpoint. Given these symptoms, Dr. Idjadi ordered an MRI to evaluate the joint.

22. The MRI taken on January 18, 2008 demonstrated a recurrent tear of the anterior portion of the ACL graft and a full-thickness chondral loss focally over the posterolateral tibial plateau. The recurrent tear when Honeycutt fell on the ice in his driveway was related in

part to the weakened condition of his knee from the original injury. Dr. Idjadi concluded that another surgery was necessary.

23. On February 8, 2008, Dr. Idjadi performed a second surgery to revise the ACL reconstruction, shave down and debride the condral injury, remove the prior hardware from the knee, and reconstruct the ACL with a posterior tibial allograft.

24. In his last visit to Dr. Idjadi on September 29, 2008, seven months post-surgery, Honeycutt was noting some "popping" behind the knee cap. He continued to have trace swelling of the knee and he had "tenderness both medially and laterally." Dr. Idjadi discharged Honeycutt with instructions to use his ACL specific knee brace for any cutting activities, golf, or running.

25. Honeycutt decided to have another examination done by orthopedic surgeon David S. Badger, M.D. at Washington Sports Medicine Associates in Kirkland, Washington on October 13, 2008. Like his appointment with Dr. Idjadi two weeks before on September 29, 2008, Dr. Badger noted: "He has clicking and popping in his knee" and "He does have medial joint line tenderness." On physical examination, Dr. Badger noted subpatellar crepitus to range of motion. Concerned about the possibility of a re-tear of the ACL, Dr. Badger ordered an MRI to further explore the issue.

26. An MRI taken on October 15, 2008 demonstrated cystic changes within the femoral and tibial tunnels that suggested an ongoing problem with the graft following the prior surgery. The ACL graft was totally intact and there was no evidence of a re-tear of the meniscus.

27. When Honeycutt returned on Dr. Badger on March 2, 2009, he continued to have ongoing pain and instability in the right knee. Given the ongoing symptoms and MRI

findings, the decision was made to proceed with a right knee diagnostic operative arthroscopy with ACL revision with allograft.

28. On March 10, 2009, Honeycutt returned to the operating room for his third right knee surgery. Dr. Badger noted on direct examination during surgery that the ACL was completely lax in both flexion and extension. Id. Dr. Badger thought that the tibial tunnel was out-of-place and re-drilled the tibial tunnel to allow better placement. In obtaining a better placement of the tunnel, Dr. Badger was able to address the stretching and impingement of the ACL. After re-drilling the tunnel, Dr. Badger revised the ACL with an allograft. The surgery went without significant complications. There appeared to be no healing of the graft placed in the second surgery.

29. The Court finds that all three surgeries performed on Honeycutt's right knee were caused, at least in part, by the subject injury on August 1, 2007. FCA has paid for all medical treatment and rehabilitation related to these three surgeries and no further past medical cure is owed. Honeycutt never returned for further care. There are no future economic losses claimed by Honeycutt. There is no persuasive evidence that significant pain and suffering has continued past his discharged from care on June 2, 2009.

30. The parties have stipulated that the total economic loss suffered by Plaintiff was $56,057. Using the methodology adopted by the parties, that loss is $8,867 for the year 2007, $31,226 for the year 2008, and $15,963 for the year 2009.

31. As to the year 2007, the Court awards the full economic loss of $8,867 (less comparative negligence), which amounts to $6,650.25. The medical testimony however, is that Honeycutt was recovering well from his surgery when, on about January 14, 2008, he chose to go outside to start his wife's car on a frosty morning. On that morning he

slipped on the ice and re-tore his ACL. Absent this event, he would not have needed either his second or third surgeries.

32. Additionally, as to the need for the third surgery, the evidence shows on September 29, 2008, Honeycutt reported to Dr. Idjadi with a functioning knee and no signs of an additional ACL tear. Approximately 15 days later he reported to Dr. Badger, at which time his Lachman's test was abnormal. The MRI confirmed Dr. Badger's suspicions and the surgery confirmed that the graft had not healed. While the change in condition between the doctors visits is puzzling, there is no other evidence to suggest that a re-injury occurred and but for the original injury on board the vessel this set of circumstances would not have occurred.

33. Based upon this evidence, the Court concludes that while surgeries two and three may be related in part to the injury abroad the vessel, they are also related to Honeycutt's failure to properly follow his physician's advice to wear a brace when walking on slippery surfaces and to access the danger presented. The economic loss for 2008 is $31,226.00. The economic loss for 2009 is $15,963.00. The Court reduces these sums by 25 percent based upon the comparative negligence from Honeycutt's initial injury. This total is then reduced by another 20 percent for Plaintiff's failure to mitigate.

34. In sum, the Court finds Honeycutt's economic damages from 2007 to 2009 are as follows:

| | | |
|---|---|---|
| 2007 | $8,867 – 25 percent due to comparative negligence = | $6,650.25 |
| 2008 | $31,226 – 25 percent due to comparative negligence = | $23,419.50 |
| | $23,419.50 – 20 percent due to failure to mitigate = | $18,735.60 |
| 2009 | $15,963 – 25 percent due to comparative negligence = | $11,972.25 |

$11,972.25 – 20 percent due to failure to mitigate = $9,577.80

Total Economic Damages: $34,963.65

35. The medical records and testimony from Honeycutt show that he recovered fairly rapidly and normally from his first, second, and third surgeries. The Court awards $35,000 in general damages for each of these surgeries. This is reduced by 25 percent for comparative fault for the first surgery period. For the second and third surgery periods, this is further reduced by 20 percent based on Honeycutt's failure to mitigate.

36. In sum, the Court finds Honeycutt's general damages are as follows—

Surgery #1    $35,000 – 25 percent due to comparative negligence = $25,250

Surgery #2    $35,000 – 25 percent due to comparative negligence = $25,250

$25,250 – 20 percent due to failure to mitigate = $21,000

Surgery #3    $35,000 – 25 percent due to comparative negligence = $25,250

$25,250 – 20 percent due to failure to mitigate = $21,000

Total General Damages: $68,250

## Conclusions of Law

37. Having heard all of the evidence, the Court concludes that Plaintiff has established negligence under the Jones Act and unseaworthiness by a preponderance of the evidence and judgment is therefore entered in favor of Plaintiff.

38. The defense of comparative negligence is available to both the Jones Act and unseaworthiness claim. Based upon the Court's findings above, that assessment is 25 percent in this case.

39. Plaintiff has an obligation to mitigate his damages on both a Jones Act and unseaworthiness claim. Based upon the Court's discussion of the facts above, it is

concluded that Honeycutt failed properly to mitigate his losses and his resulting damages from the second and third surgeries are reduced by 20 percent based upon his failure to mitigate.

40. Prejudgment interest is awarded as a matter of course in admiralty actions. Honeycutt is awarded prejudgment interest on all past damages. The parties are requested to attempt to calculate the amount of prejudgment interest and if they are unable to do so, Honeycutt shall file a motion on this issue within 15 days of the entry of these Findings of Fact and Conclusions of Law.

Dated this <u>6th</u> day of July, 2012.

*Marsha J. Pechman*
Marsha J. Pechman
United States District Judge